IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:12-CV-357-D

| | |
|---|---|
| THE CAPER CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     **ORDER** |
| | ) |
| WELLS FARGO BANK, N.A., | ) |
| | ) |
| Defendant. | ) |

On November 26, 2012, the Caper Corporation ("Caper" or "plaintiff") filed a complaint

against Wells Fargo Bank ("Wells Fargo" or "defendant") in New Hanover County Superior Court

[D.E. 1-1]. On December 27, 2012, Wells Fargo removed the action to this court [D.E. 1]. The

action arises out of Caper's dissatisfaction with a loan contract and an associated interest rate swap

contract that the parties entered in 2005. In the complaint, Caper alleges fraud, negligent

misrepresentation, duress, breach of fiduciary duty, constructive fraud, and unfair and deceptive

trade practices, and seeks damages and reformation or rescission of the contracts. On January 30,

2013, Wells Fargo moved to dismiss the complaint [D.E. 12] and filed a supporting memorandum

and exhibits [D.E. 13]. See Fed. R. Civ. P. 12(b)(6). Caper responded in opposition [D.E. 19], and

Wells Fargo replied [D.E. 20]. As explained below, the court grants Well's Fargo's motion to

dismiss.

I.

In March 2005, Caper contacted Wells Fargo's predecessor, Wachovia Bank, and other

lending institutions to inquire about a loan Caper wanted in order to acquire an office building ("the

property") in Wilmington, North Carolina. Compl. [D.E. 1-1] ¶¶ 12–13. Although Wells Fargo did

not offer the best loan terms, Caper accepted Wells Fargo's offer due to the parties' prior business dealings. Id. ¶ 13. On April 8, 2005, Wells Fargo loaned Caper $3.8 million, secured by a deed of trust to the property. Id. ¶ 14. The seven-year loan included a one-year variable interest rate followed by a six-year fixed interest rate, and required Caper to repay all unpaid principal and interest at maturity. Id. Caper purchased the property, and on July 1, 2005, entered a 7-year lease with a tenant. Id. ¶ 15.

When the tenant notified Caper that it wished to occupy additional portions of the property, Caper sought additional funds to upfit those portions. Id. ¶ 16. Wells Fargo offered a $4.3 million, ten-year loan with a variable interest rate set at the one-month LIBOR rate plus 1.75%, and stated that Caper could obtain a fixed rate through an interest rate swap. Id. ¶¶ 17–18.[1]

On November 9, 2005, Walter Pancoe ("Pancoe"), Caper's president, contacted Wells Fargo and spoke with Matt Boss ("Boss") regarding an interest rate swap. Id. ¶ 19. Boss sent Pancoe materials that discussed how Caper could hedge against rising interest rates by obtaining a fixed interest rate using an interest rate swap. Id. The materials reflected that the interest rate swap could be matched with the loan's term, interest rate, and principal amount. Id. ¶ 20. Boss also sent Caper an ISDA Master Agreement ("Master Agreement") [D.E. 13-1] and a Schedule to the ISDA Master Agreement ("Schedule") [D.E. 13-2] (collectively, "Swap Agreement") that set forth the terms of a proposed swap agreement. Id. ¶ 22.

---

[1] An "interest rate swap" is a standalone interest rate hedging instrument whereby two parties pay each other interest based on a notional principal amount (i.e., an agreed hypothetical principal amount). See Thrifty Oil Co. v. Bank of Am., 322 F.3d 1039, 1042–43 (9th Cir. 2003). The first party pays a fixed interest rate to the second party, while the second party pays a variable interest rate to the first party. If the first party is a borrower with a variable interest rate loan, where the loan interest rate and swap interest rate are the same, and the notional principal amount is equal to the loan principal, the loan holder effectively pays only a fixed interest rate. See id. Incoming payments under the interest rate swap offset any interest due under the loan, leaving a net payment at the fixed interest rate. See id.

Boss advised Pancoe that Wells Fargo was offering the Refinance Loan to Caper at market rates. Id. ¶ 51. The term sheet for the Refinance Loan mentioned costs including a 0.25% fee, an appraisal fee, environmental assessment costs, title insurance, and legal fees, but the Swap Agreement did not mention any markup for the bank above interdealer broker market loan rates. Id. ¶¶ 52–53. Based on Caper's prior loans from Wells Fargo, Pancoe believed that Wells Fargo was not charging any additional fees or receiving any additional payments for the Swap Agreement. Id. ¶ 54. Pancoe also believed that Wells Fargo was offering the Refinance Loan and Swap Agreement at interdealer broker market rates without any markup for the bank. Id. ¶ 55. Caper did not have access to information about such market rates, because the interdealer broker market is a closed market open only to large commercial and investment banks; therefore, Caper relied on Wells Fargo's knowledge of such rates. Id. ¶¶ 56–58. Caper did not seek legal advice regarding the Refinance Loan or the Swap Agreement. Id. ¶ 59.

On November 21, 2005, in a telephone call with Boss, Pancoe confirmed an interest rate swap with a notional amount of $4.3 million and a ten-year term, under which Caper would pay interest at a fixed 6.91% rate and would receive variable interest payments at the one-month LIBOR plus 1.70%. Id. ¶ 24. The fixed interest rate of 6.91% was 0.32% higher than the interdealer broker market rate. Id. ¶ 61. The same day, Pancoe signed the Swap Agreement on Caper's behalf. Id. ¶ 25. In December 2005, Caper received a confirmation memorializing the November 21, 2005 phone call, which he signed and returned to Wells Fargo. Id. ¶ 26.

Before finalizing the Refinance Loan, Wells Fargo changed the term it offered on the Refinance Loan from ten years to slightly longer than six years, so that the Refinance Loan would mature at the same time as the original loan. Id. ¶ 27. Thus, the durations of the Refinance Loan and the Swap Agreement became mismatched by more than three years. Id. ¶ 28. Pancoe raised this

3

discrepancy with Wells Fargo vice president Randall Tomsic ("Tomsic"), and said the terms of the loan and the Swap Agreement should be the same. Id. ¶ 29. Tomsic stated that the discrepancy was immaterial, and that Caper would not owe any termination fee or other penalty if it exited the Swap Agreement at or before maturity of the Refinance Loan. Id. In response to Pancoe's questioning, Tomsic reiterated that Caper's obligations under the Swap Agreement would end when its obligations under the Refinance Loan ended. Id. Based on those representations, Pancoe executed a Promissory Note for the Refinance Loan on behalf of Caper on January 23, 2006. Id. ¶ 30.

On February 2, 2006, Caper and Wells Fargo agreed to amend the terms of the Swap Agreement so that the monthly payment dates of the Refinance Loan and the Swap Agreement would be the same. Id. ¶ 31. Wells Fargo also added a provision allowing the bank to terminate the Swap Agreement if the agreement became unsecured at any time after March 12, 2012 (the maturity date of the Refinance Loan). Id. ¶ 32; see Swap Amendment [D.E. 13-4] 1–3. From February 2006 to April 2011, Caper made all payments required under the Refinance Loan and the Swap Agreement. Compl. ¶ 34.

In April 2011, Caper's tenant notified Caper that it would not renew its lease after the lease expired in June 2012. Id. ¶ 35. Caper then asked Wells Fargo for an extension of the Refinance Loan from March 15, 2012, to October 31, 2012, or for a bridge loan. Id. Caper also requested that the Swap Agreement be terminated at the end of the term of the Refinance Loan without any termination fee. Id.

In May 2011, during negotiations regarding a new loan, Wells Fargo asserted that it would hold Caper to the entire term of the Swap Agreement and require the payment of a termination fee if Caper ended the agreement early. Id. ¶ 36. When Caper objected, Wells Fargo indicated that it would consider allowing Caper to terminate the Swap Agreement without paying an early

4

termination fee. Id. On October 31, 2011, Caper informed Wells Fargo that it had negotiated an extension of the tenant's lease through November 1, 2012, and requested an extension of the Refinance Loan and that Caper be allowed to terminate the Swap Agreement without paying any fees. Id. ¶ 37. Wells Fargo orally agreed extend the Refinance Loan through November 15, 2012. Id.

Tomsic informed Caper that Wells Fargo had sold the Swap Agreement to a third party and would lose money if Wells Fargo did not recover all payments due under the agreement, which was worth approximately $620,000. Id. ¶ 38. Wells Fargo, however, actually had not sold the Swap Agreement. Id.

Wells Fargo did not extend the term of the Refinance Loan. Id. ¶ 39. Instead of seeking new financing, in February 2012, Caper decided to sell the property. Id. ¶ 40. Wells Fargo notified Caper that Caper was obligated to continue making payments under the Swap Agreement or to pay a termination fee if the agreement was terminated. Id. Caper responded that it would not pay any termination fee. Id. Wells Fargo then assigned management of the Refinance Loan to James Gragnolati ("Gragnolati"), an employee in Wells Fargo's troubled assets division. Id.

Because the parties had not agreed on a loan extension, the Refinance Loan matured on March 15, 2012. Id. ¶ 41. Pancoe advised Gragnolati that Caper wanted to shorten the Swap Agreement's term to match the term of the Refinance Loan. Id. Shortly thereafter, Gragnolati orally agreed to extend the Refinance Loan to June 15, 2015, the maturity date of the Swap Agreement. Id. No such extension occurred. Instead, on April 11, 2012, Wells Fargo agreed to extend the Refinance Loan until September 30, 2012. Id. ¶ 42.

In May 2012, Caper reached an agreement to sell the property and requested a payoff of the Refinance Loan in preparation for a June 2012 closing date. Id. ¶ 43. Caper requested that Wells

5

Fargo terminate the Swap Agreement without a termination fee when the Refinance Loan was repaid. Id. However, Wells Fargo demanded that Caper pay a $585,526 termination fee then owed under the Swap Agreement before Wells Fargo would allow Caper to repay the Refinance Loan and obtain a release of the deed of trust held by Wells Fargo. Id. Wells Fargo's demand forced Caper to choose between breaching the contract for sale of the property and payment of the termination fee. Id. ¶ 44.

On June 28, 2012, Caper closed on the sale of its property and repaid the Refinance Loan. Id. 45. Wells Fargo terminated the Swap Agreement and demanded that Caper pay a $568,337 termination fee. Id. Caper agreed to pay the termination fee to avoid breaching its obligation to deliver a deed free of liens. Id. Wells Fargo asked Caper to release all of its claims against the bank, but Caper refused. Id. Instead, Caper executed a Confirmation of Termination to which it appended language noting that it paid the termination fee under duress, under protest, and reserving all rights to contest the fee. Id.; [D.E. 13-12]. Wells Fargo then released the deed of trust. Compl. ¶ 46.

Over the term of the loan, Caper paid Wells Fargo $97,666 more at the 6.91% fixed rate than it would have paid at the 6.59% interdealer broker market rate (the "overcharges"). Id. ¶ 62. Wells Fargo was aware that the overcharges represented payments above the interdealer broker market rate. Id. ¶ 63. The overcharges allowed Wells Fargo to profit on the Swap Agreement. Id. ¶¶ 63–64. However, Wells Fargo did not disclose to Caper that the bank would profit from the Swap Agreement, and instead represented that the Swap Agreement entailed no fees. Id. ¶ 65. Wells Fargo charged Caper an additional $4,200 above the amount owed in setting the termination fee. Id. ¶ 66.

According to the complaint, Caper and Wells Fargo chose the one-month LIBOR rate as a basis for the Swap Agreement's variable rate and that (when chosen) the choice was rational and

6

fundamentally sound. Id. ¶ 67. However, after entering the Swap Agreement, the conduct of other banks and governments artificially depressed the LIBOR rate from 2005 to 2009. See id. ¶¶ 67–83. Ultimately, according to Caper, the depression of the LIBOR rate allowed Wells Fargo to profit on the Swap Agreement because the bank paid an artificially low variable rate while Caper paid a higher fixed rate. See id. Caper also contends that the rate differential resulted in a large termination fee. Id. ¶ 83.

Caper asserts the following claims: (1) fraud regarding the assurances that Caper would not owe a termination fee, id. ¶¶ 85–98; (2) negligent misrepresentation regarding the same, id. ¶¶ 99–103; (3) economic duress resulting from Wells Fargo's demand that Caper pay the termination fee before the bank would release its deed of trust, id. ¶¶ 104–10; (4) fraudulent overcharges arising from Wells Fargo's failure to disclose income derived from the Swap Agreement, id. ¶¶ 111–21; (5) negligent misrepresentation with respect to the market rates, resulting in the overcharges, id. ¶¶ 122–26; (6) breach of fiduciary duty arising from Wells Fargo's representation that the Swap Agreement would be beneficial to Caper, id. ¶¶ 127–36; (7) constructive fraud arising from Wells Fargo's taking advantage of its position of trust with respect to Caper in order to profit at Caper's expense, id. ¶¶ 137–39; (8) unfair and deceptive trade practices in violation of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. §§ 75-1.1–75.16, arising from the foregoing, id. ¶¶ 140–44; (9) rescission or reformation of the Swap Agreement due to frustration of purpose and mutual mistake, id. ¶¶ 145–52; and (10) rescission or reformation of the Swap Agreement due to its unsuitability for Caper. Id. ¶¶ 153–58.

II.

A motion to dismiss under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted" tests whether the complaint is legally and factually sufficient. See Fed. R. Civ. P.

7

12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Coleman v. Md. Court of Appeals, 626 F.3d 187, 190 (4th Cir. 2010), aff'd, 132 S. Ct. 1327 (2012); Giarratano v. Johnson, 521 F.3d 298, 302 (4th Cir. 2008); accord Erickson v. Pardus, 551 U.S. 89, 93–94 (2007) (per curiam). A court need not accept a complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009). However, the court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." Id. In considering the motion, the court may consider documents attached to the complaint and documents attached to the motion to dismiss if those documents are integral to the complaint and authentic. Philips v. Pitt Cnty. Mem'l Hosp., 527 F3d 176, 180 (4th Cir. 2009); Sec'y of State for Def. v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007).

A federal court sitting in diversity must apply the substantive law of the forum state—in this case, North Carolina—including the state's choice of law rules. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496–97 (1941); Colgan Air, Inc. v. Raytheon Aircraft Co., 507 F.3d 270, 275 (4th Cir. 2007) (per curiam); Hitachi Credit Am. Corp. v. Signet Bank, 166 F.3d 614, 624 (4th Cir. 1999); Martinez v. Nat. Union Fire Ins. Co., 911 F. Supp. 2d 331, 335 (E.D.N.C. 2012). North Carolina enforces parties' contractual choice-of-law provisions "as long as they had a reasonable basis for their choice and the law of the chosen State does not violate a fundamental public policy of [North Carolina] or otherwise applicable law." Sawyer v. Market Am., Inc., 190 N.C. App. 791, 794, 661 S.E.2d 750, 752 (2008) (quotation omitted); see N.C. Gen. Stat. § 25-1-301; Tanglewood Land Co. v. Byrd, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980); Torres v. McClain, 140 N.C. App. 238, 241, 535 S.E.2d 623, 625 (2000). The court need not decide which state law applies to

8

a particular claim if the law of the state that the parties allegedly selected and the law otherwise applicable are the same. See Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., 386 F.3d 581, 600–01 (4th Cir. 2004); cf. Hitachi Credit Am. Corp., 166 F.3d at 624.

Here, the parties agreed that the Swap Agreement would "be governed by and construed in accordance with the law of the State of New York." [D.E. 13-2] ¶ 4(e). The parties dispute whether this choice-of-law provision controls claims one through seven.[2] Thus, the court initially addresses what law applies to claims one through seven.

Claims one through seven, sound in tort but relate to the subject matter and formation of the Swap Agreement. Wells Fargo argues that New York law governs these claims because they are "really nothing other than breach of contract claims disguised as tort claims." Def.'s Reply [D.E. 20] 2 n.1. Caper responds that, because the choice-of-law provision does not mention tort claims, these claims fall under North Carolina's lex loci delicti rule and North Carolina law governs. See Pl.'s. Resp. Opp. Mot. Dismiss [D.E. 19] 8.

Although Caper's tort claims are contract-related, Wells Fargo's potential liability arises not from the contract but from Wells Fargo's alleged fraud, negligent misrepresentation, breach of fiduciary duty, and duress. See Robinson v. Ladd Furniture, Inc., 995 F.2d 1064, 1993 WL 211309, at *4–5 (4th Cir. 1993) (per curiam) (unpublished table decision) (collecting cases); Glaesner v. Beck/Arnley Corp., 790 F.2d 384, 386 n.1 (4th Cir. 1986); ITCO, 722 F.2d at 49 n.11 (noting that a choice-of-law provision did not cover a UDTPA claim because the "nature of the liability allegedly

---

[2]  The parties do not dispute the law applicable to claims eight, nine, and ten. North Carolina law governs Caper's eighth claim, a UDTPA claim. ITCO Corp. v. Michelin Tire Corp., 722 F.2d 42, 49 n.11 (4th Cir. 1983); Martinez, 911 F. Supp. 2d at 338; United Va. Bank v. Air-Lift Assocs., 79 N.C. App. 315, 320–21, 339 S.E.2d 90, 93–94 (1986). New York law governs Caper's ninth and tenth claims, claims for recision or reformation of the Swap Agreement. See [D.E. 13-2] ¶ 4(e); Hitachi Credit Am. Corp., 166 F.3d at 624.

9

to be imposed . . . is ex delicto, not ex contractu"); United Va. Bank, 79 N.C. App. at 320–21, 339 S.E.2d at 93–94. Accordingly, because the allegedly tortious conduct occurred in North Carolina, North Carolina law appears to apply. However, the court need not reach this issue unless there is a material conflict between North Carolina and New York law on claims one through seven. See CLM Equip. Co., 386 F.3d at 600. Here, there is not a material conflict between North Carolina law and New York law on claims one through seven. Thus, the court need not decide whether North Carolina or New York law applies to these claims.

In its first and second claims, Caper alleges that Wells Fargo fraudulently or negligently misrepresented that Caper would not have to pay a fee if the Swap Agreement was terminated before its contractual termination date. In North Carolina, the elements of fraud are "(1) [a] false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party," where "any reliance on the allegedly false representations must be reasonable." Forbis v. Neal, 361 N.C. 519, 526–27, 649 S.E.2d 382, 387 (2007); Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co., 332 N.C. 1, 17, 418 S.E.2d 648, 658 (1992). The law of New York is not materially different. See, e.g., Mandarin Trading Ltd. v. Wildenstein, 16 N.Y.3d 173, 178, 944 N.E.2d 1104, 1108 (2011). In North Carolina, to state a claim of negligent misrepresentation, a plaintiff must allege that he "[1] justifiably relie[d] [2] to his detriment [3] on information prepared without reasonable care [4] by one who owed the relying party a duty of care." Raritan River Steel Co. v. Cherry, Bekaert & Holland, 322 N.C. 200, 206, 367 S.E.2d 609, 612 (1988); Brinkman v. Barrett Kays & Assocs., 155 N.C. App. 738, 742, 575 S.E.2d 40, 43–44 (2003). The law of New York is not materially different. See, e.g., J.A.O. Acquisition Corp. v. Stavitsky, 8 N.Y.3d 144, 148, 863 N.E.2d 585, 587 (2007).

The "question of justifiable reliance [for negligent misrepresentation claims] is analogous

to that of reasonable reliance in fraud actions." Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP, 350 N.C. 214, 224, 513 S.E.2d 320, 327 (1999) (quotation omitted). For both causes of action, whether the plaintiff reasonably relied on the defendant's representations is ordinarily a question for the jury "'unless the facts are so clear as to permit only one conclusion.'" Id., 350 N.C. at 224–25, 513 S.E.2d at 327 (quoting Restatement (Second) of Torts § 552 cmt. e (1977)) (emphasis omitted). One scenario where the facts permit only one conclusion arises when a plaintiff alleges misrepresentations that are "directly contrary" to the express terms of a written contract. Reliance on such misrepresentations is unreasonable as a matter of law. Int'l Harvester Credit Corp. v. Bowman, 69 N.C. App. 217, 219–220, 316 S.E.2d 619, 621 (1984) (collecting cases); see Davis v. Davis, 256 N.C. 468, 471–73, 124 S.E.2d 130, 133–34 (1962); Isley v. Brown, 253 N.C. 791, 793–94, 117 S.E.2d 821, 823–24 (1961); Eastway Wrecker Serv., Inc. v. City of Charlotte, 165 N.C. App. 639, 645–46, 599 S.E.2d 410, 414 (2004), aff'd, 360 N.C. 167, 622 S.E.2d 495 (2005); Allied Personnel of Raleigh, Inc. v. Alford, 25 N.C. App. 27, 30–31, 212 S.E.2d 46, 48–49 (1975); see also Am. Chiropractic v. Trigon Healthcare, 367 F.3d 212, 234–35 (4th Cir. 2004); Foremost Guaranty Corp. v. Meritor Savings Bank, 910 F.2d 118, 125–26 (4th Cir. 1990); SunTrust Mortgage Inc. v. Busby, 651 F. Supp. 2d 472, 484–87 (W.D.N.C. 2009). The principle comports with the "duty to act with reasonable prudence for [one's] own safety . . . . One who signs a written contract without reading it, when he can do so understandingly, is bound thereby unless the failure to read is justified by some special circumstance." Davis, 256 N.C. at 471–72, 124 S.E.2d at 133.

Here, numerous provisions of the Swap Agreement and the promissory notes that Caper executed expressly contradict any statements that Wells Fargo or its agents made indicating that Caper would not owe a termination fee if the Swap Agreement was terminated early. See, e.g., Master Agreement § 6(e) (requiring payment in the event of early termination); Schedule pt. 1(f)

11

(describing method of calculating fee upon early termination); id. pt. 5(c)(2) ("[Caper] understands that . . . any early termination . . . may require one party to pay an early termination fee to the other party . . . ."); id. pt. 5(j) (providing that Swap Agreement and any related loans constitute independent obligations, and that a termination fee may be owed in the event of a loan payoff); Swap Amendment 1 ("[Caper] hereby acknowledges that the payments due under [the Swap Agreement] shall be due . . . whether or not . . . the term of any [f]inancing is shorter or longer than the term of" the Swap Agreement); Promissory Note [D.E. 13-6] 5 ("All swap agreements . . . are independent agreements governed by [their] written provisions . . . , which will remain in full force and effect, unaffected by any repayment [or] prepayment . . . of this Note . . . ."); Refinance Loan Promissory Note [D.E. 13-10] 5 (same). Caper could have learned the truth about its legal obligation to pay a termination fee by reading the agreements. Cf. Davis, 256 N.C. at 471–72, 124 S.E.2d at 133; Stunzi v. Medlin Motors, Inc., 714 S.E.2d 770, 777 (N.C. Ct. App. 2011) ("one who signs a paper writing is under a duty to ascertain its contents" and "is held to have signed with full knowledge and assent as to what is therein contained"). Accordingly, accepting as true that Wells Fargo orally misrepresented Caper's obligation to pay a termination fee in the event of early termination of the Swap Agreement, Caper's reliance on such oral misrepresentations was not reasonable or justifiable in light of the written contract. Thus, Caper's claims for fraud and negligent misrepresentation fail.

In opposition to this conclusion, Capers notes that the failure of reasonable or justifiable reliance may be overcome where the party who made the misrepresentation "stands in a fiduciary relationship to the signing party." Int'l Harvester, 69 N.C. App. at 220, 316 S.E.2d at 621; see Vail v. Vail, 233 N.C. 109, 116–17, 63 S.E.2d 202, 207–08 (1951). However, "an ordinary debtor-creditor relationship generally does not give rise to" a fiduciary relationship. Branch Banking & Trust Co. v. Thompson, 107 N.C. App. 53, 60–61, 418 S.E.2d 694, 699 (1992); see Oddo Asset

12

Case 7:12-cv-00357-D Document 21 Filed 08/22/13 Page 12 of 21

Mgmt. v. Barclays Bank PLC, 19 N.Y.3d 584, 593, 973 N.E.2d 735, 741 (2012). "Rather, parties to a contract do not thereby become each others' fiduciaries; they generally owe no special duty to one another beyond the terms of the contract and the duties set forth in the [Uniform Commercial Code]." Branch Banking, 107 N.C. App. at 61, 418 S.E.2d at 699; see Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 347–48 (4th Cir. 1998); Highland Paving Co. v. First Bank, 742 S.E.2d 287, 292–93 (N.C. Ct. App. 2013). A fiduciary duty arises only when the first party reposes "a special confidence" in the second party, resulting in "domination and influence" by the second party. Dalton v. Camp, 353 N.C. 647, 651, 548 S.E.2d 704, 707–08 (2001); see People v. Coventry First, LLC, 13 N.Y.3d 108, 115, 915 N.E.2d 616, 620 (2009); see also Cathy Daniels, Ltd. v. Weingast, 91 A.D.3d 431, 433, 936 N.Y.S.2d 44, 47 (N.Y. App. 2012).

Here, Caper alleges that Wells Fargo "became a trusted advisor to Caper, authoring the terms and details of many of Caper's financial transactions," Compl. ¶ 9; that Caper "had a 30 year relationship" with Wells Fargo and that the City Executive for Wells Fargo was Capers "trusted advisor," id. ¶ 11; that Caper "chose to borrow the funds from [Wells Fargo] because of Caper's prior business dealings with, confidence in, and reliance on" Wells Fargo, id. ¶ 13; that Caper entered into the Swap Agreement "[b]ecause of Caper's confidence in, and reliance on" Wells Fargo, id. ¶ 59; that Pancoe "reasonably trusted Tomsic, Boss, and others on behalf of [Wells Fargo] to act in the best interests of Caper, id. ¶ 128; that Caper "reasonably reposed a special confidence and trust in" Wells Fargo and that the bank "was bound to act in good faith with due regard to the interests of Caper," id. ¶ 131; that Wells Fargo "had superiority, control, and influence over Caper and was able exercise domination and control over Caper because of the superior knowledge of the terms and risks and pricing" of interest rate swap agreements, id. ¶ 132; that Wells Fargo "has a duty to act in the best interests of its customers, including Caper," id. ¶ 133; and that Wells Fargo "took

13

advantage of its position of trust with Caper." Id. ¶ 138.

These statements are merely conclusory, and do not plausibly allege the existence of a fiduciary relationship. See, e.g., Synovus Bank v. Coleman, 887 F. Supp. 2d. 659, 671–72 (W.D.N.C. 2012). Caper does not plausibly allege any facts suggesting that Wells Fargo had "superiority, control, and influence" over Caper. Instead, the complaint shows that Caper is a sophisticated business entity that "for a number of years acquired, developed, and sold a variety of real properties," including commercial office buildings, an office park, and residential developments, and acquired millions of dollars of financing to do so. Compl. ¶¶ 9, 14. Caper approached Wells Fargo and "other lending institutions" when it sought financing to purchase the property. Id. ¶ 13. Rather than lacking understanding or having inferior knowledge, Caper (through Pancoe) understood the risks posed by a mismatch between the terms of the Swap Agreement and the Refinance Loan, respectively. Id. ¶¶ 28–29. Caper simply was unable through negotiation to convince Wells Fargo to agree to shorten the term of the Swap Agreement to match the loan term. Id. ¶¶ 32–33, 37. Thus, Caper has failed to plausibly allege any circumstance beyond an arm's-length, creditor-debtor relationship between a bank and a sophisticated, repeat business customer. In particular, Caper has not plausibly alleged facts that Caper held Wells Fargo in "special confidence" or any "resulting dominance and influence" by Wells Fargo. Accordingly, Caper has failed to plausibly allege the existence of a fiduciary relationship to overcome its lack of reasonable or justifiable reliance on Wells Fargo's alleged misrepresentations, and Caper's claims for fraud and misrepresentation fail. See, e.g., Raritan River Steel, 322 N.C. at 206, 367 S.E.2d at 612; J.A.O. Acquisition, 8 N.Y.3d at 148, 863 N.E.2d at 587.

In its third claim, Caper alleges economic duress resulting from Wells Fargo's demand that Caper pay the termination fee before Wells Fargo would release its deed of trust. Compl. ¶¶ 104–10.

14

A plaintiff asserting a claim of economic duress must plausibly allege "that one party to a contract has threatened to breach the agreement by withholding performance unless the other party agrees to some further demand." 805 Third Ave. Co. v. M.W. Realty Assocs., 58 N.Y.2d 447, 451, 448 N.E.2d 445, 447 (1983); see Rose v. Vulcan Materials Co., 282 N.C. 643, 664–665, 194 S.E.2d 521, 535–36 (1973); Link v. Link, 278 N.C. 181, 194–96, 179 S.E.2d 697, 705–06 (1971); Longiotti v. Wachovia Bank & Trust Co., 25 N.C. App. 532, 537, 214 S.E.2d 205, 208 (1975).

    Caper fails to plausibly allege any breach or threatened breach of contract by Wells Fargo. The parties agreed that Wells Fargo would be entitled to hold any collateral supporting the Swap Agreement until Caper's obligations thereunder "are completely satisfied notwithstanding any repayment . . . of any such loan or other financing." Schedule pt. 5(j). The deed of trust itself allowed Wells Fargo to hold the deed until Caper paid all obligations due under the Swap Agreement. [D.E. 13-7] 1–2 (granting property to Wells Fargo to "secure payment and performance of obligations under . . . swap agreements . . . between [Wells Fargo] and [Caper]," "in fee simple, forever" until "all [o]bligations are timely paid and performed"). Thus, Wells Fargo did not threaten a breach. Rather, it merely asserted its contractual right to hold the deed of trust as collateral for the Swap Agreement. This act cannot support a claim of economic duress. See, e.g., Bell Bakeries, Inc. v. Jefferson Standard Life Ins. Co., 245 N.C. 408, 419–20, 96 S.E.2d 408, 416–17 (1957); Longiotti, 25 N.C. App. at 537, 214 S.E.2d at 208; 805 Third Ave. Co., 58 N.Y.2d at 451, 448 N.E.2d at 447. Moreover, the termination fee was not a "further demand." It was a payment the Swap Agreement explicitly contemplated and required. Accordingly, Caper's economic duress claim fails.

In its fourth and fifth claims, Caper alleges that Wells Fargo fraudulently or negligently misrepresented that Caper would receive a market rate as the fixed rate under the Swap Agreement, resulting in overcharges. Compl. ¶¶ 111–26. Specifically, Caper alleges that Wells Fargo

15

represented that "the interest rate swap would be extended to Caper at 'a market-derived rate,'" id. ¶ 50, and that Boss "similarly advised Pancoe in telephone conversations that the Refinanced Loan was being offered to Caper at market rates." Id. ¶ 51. Furthermore, according to Caper, Wells Fargo did not disclose any fees or profits associated with the Swap Agreement. Id. ¶ 54. "Consequently, Pancoe, on behalf of Caper, believed that the Bank was not charging any fee or otherwise receiving any payment" under the Swap Agreement. Id. Thus, Caper believed Wells Fargo was offering the Swap Agreement at the market rate of the interdealer broker market, "a closed market[] open only to the largest commercial and investment banks." Id. ¶ 56. Instead, however, Wells Fargo "was charging Caper substantial fees and earning substantial income in connection with" the Swap Agreement. Id. ¶ 112.

Caper fails to plausibly allege any misrepresentation by Wells Fargo. Although Caper alleges that Wells Fargo offered an interest rate swap at a "market rate" or a "market-derived rate," Caper does not allege that Wells Fargo or any bank representative specifically offered Caper the interdealer broker market rate. The phrase "market-derived rate" implies something other than a market rate. Even viewing the complaint in the light most favorable to Caper, the alleged facts state nothing more than conjecture on Caper's part that Wells Fargo's offer of a "market rate" or "market-derived rate" meant the interdealer broker market rate, as opposed, for instance, to the market rate for the bank's commercial customers or the market rate for a customer with Caper's credit profile.

Tellingly, Caper does not allege that it sought to clarify what Wells Fargo meant by "market rate" or "market-derived rate." Instead, Caper assumed, based on Wells Fargo's previous disclosure of fees in fixed-rate loan transactions to conclude that the non-disclosure of fees in connection with the Swap Agreement meant that the bank would make no profit on the interest rate swap. See id. ¶ 54. This logical leap is unsupported by Caper's allegations that Wells Fargo stated that it would not

16

profit on the interest rate swap or that the only effect of the swap would be to achieve a fixed interest rate for Caper, or that Wells Fargo typically discloses to its customers the profit it makes on each transaction. Caper's claims amount to an allegation that Wells Fargo, by uttering the phrase "market rate," misled Caper into believing that the bank was offering Caper direct access to a market open only to the largest commercial and investment banks at no cost to Caper, without considering Caper's creditworthiness and with no benefit accruing to Wells Fargo. Caper alleges no facts that could move these claims "across the line from conceivable to plausible." Twombly, 550 U.S. at 570. Thus, Caper fails to plausibly allege that Wells Fargo misrepresented that it offered Caper the interdealer broker market rate.

Furthermore, Caper's claim that Wells Fargo had a duty to disclose the income the bank would make on the Swap Agreement is ridiculous. As discussed, Wells Fargo was not acting as Caper's fiduciary. Private parties to an arm's-length business transaction have no duty to disclose their potential income or profits to each other. Accordingly, claims four and five fail.

In its sixth and seventh claims, Caper alleges that Wells Fargo committed a breach of fiduciary duty and constructive fraud. "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." Dalton, 353 N.C. at 651, 548 S.E.2d at 707; see Coventry First, 13 N.Y.3d at 115, 915 N.E.2d at 620. Likewise, a claim of constructive fraud requires the existence of a confidential or fiduciary relationship. Forbis, 361 N.C. at 528–29, 649 S.E.2d at 388; Rhodes v. Jones, 232 N.C. 547, 548–49, 61 S.E.2d 725, 726 (1950); see Levin v. Kitsis, 82 A.D.3d 1051, 1054, 920 N.Y.S.2d 131, 135 (2011). As discussed, however, Caper has not plausibly alleged facts demonstrating the existence of a confidential or fiduciary relationship between the parties. Accordingly, claims six and seven fail.

In its eighth claim, Caper alleges that Wells Fargo's acts in connection with the Swap

17

Agreement violated North Carolina's UDTPA. To state a UDTPA claim, Caper must plausibly allege that (1) Wells Fargo committed an unfair or deceptive act or practice, (2) the act or practice was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff. N.C. Gen. Stat. §§ 75-1.1, 75-16; Walker v. Fleetwood Homes of N.C., Inc., 362 N.C. 63, 71–72, 653 S.E.2d 393, 399 (2007); Dalton, 353 N.C. at 656, 548 S.E.2d at 711; RD & J Props. v. Lauralea-Dilton Enters., LLC, 165 N.C. App. 737, 748, 600 S.E.2d 492, 500 (2004). An act is deceptive if it has a tendency or capacity to deceive. Dalton, 353 N.C. at 656, 548 S.E.2d at 711; Marshall v. Miller, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981). An act is unfair "if it offends established public policy," "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," or "amounts to an inequitable assertion of . . . power or position." Carcano v. JBSS, LLC, 200 N.C. App. 162, 172, 684 S.E.2d 41, 50 (2009) (quotation omitted) (emphasis removed); Gilbane Bldg. Co. v. Fed. Reserve Bank, 80 F.3d 895, 902 (4th Cir. 1996). "Whether an act or practice is unfair or deceptive under the UDTPA is a question of law for the court." Kelly v. Georgia Pac., LLC, 671 F. Supp. 2d 785, 798–99 (E.D.N.C. 2009) (collecting cases).

In the complaint, Caper does not identify any particular acts as unfair or deceptive, but merely incorporates the complaint into the UDTPA claim. In opposition to the motion to dismiss, Caper argues that

> the Bank inequitably asserted its power by inducing Caper to buy the Swaps as a hedge against rising interest rates while assuring Caper that the discrepancy in the terms of the Refinanced Loan and the Swaps was immaterial, particularly with respect to Caper's potential obligation to pay a termination fee. This happened when Caper was already committed to the Swaps and properly trusted the Bank to tell the truth about key facts.

Pl.'s Resp. Opp. Mot. Dismiss 23. As discussed, Caper was contractually obligated to pay a termination fee under the Swap Agreement, was aware of that contractual obligation, and was

18

unable to negotiate a change in the terms of the agreement. Furthermore, Caper was aware that any alteration of the Swap Agreement had to be made in writing. <u>See</u> Master Agreement § 8(b). Thus, Wells Fargo's alleged oral representations that Caper would not owe a termination fee "did not have the capacity to deceive a reasonable businessperson." <u>RD & J Props.</u>, 165 N.C.App. at 749, 600 S.E.2d at 501. Accordingly, Caper's eighth claim fails.

In its ninth and tenth claims, which are governed by New York law, Caper seeks reformation or rescission of the Swap Agreement. However, the parties' June 28, 2012 agreement expressly terminated the Swap Agreement. Compl. ¶ 45; [D.E. 13-12]. Caper reserved only the right "to contest its liability for the Termination Fee required to be paid" under the termination agreement. [D.E. 13-12] 3. The remedies of rescission and reformation are unavailable because the contract underlying these claims no longer binds the parties. <u>See</u>, <u>e.g.</u>, <u>Miles v. Gladstein</u>, 214 A.D.2d 706, 707, 625 N.Y.S.2d 608, 609 (1995); <u>Paterno & Sons, Inc. v. Town of New Windsor</u>, 43 A.D.2d 863, 866, 351 N.Y.S.2d 445, 451 (1974). In any event, "[w]hen a contract is terminated in the course of performance, any claim which either party may have had regarding any outstanding obligation thereunder is annulled unless it is expressly or impliedly reserved in the rescission agreement." <u>M.J. Posner Constr. Co. v. Valley View Dev. Corp.</u>, 118 A.D.2d 1001, 1001–02, 499 N.Y.S.2d 997, 999 (1986). Caper did not expressly or impliedly reserve a right to seek rescission or reformation of the Swap Agreement. Thus, claims nine and ten fail.

Alternatively, to the extent reformation or rescission may be available, the claims still fail. In its ninth claim, Caper seeks rescission or reformation of the Swap Agreement due to commercial frustration of purpose and mutual mistake resulting from artificial depression of the LIBOR. Compl. ¶¶ 146–52. Frustration of purpose, however, applies only "when a change in circumstances makes one party's performance virtually useless to the other." <u>Morpheus Capital Advisors LLC v. UBS</u>

19

AG, 105 A.D.3d 145, 148, 962 N.Y.S.2d 82, 85 (2013); PPF Safeguard, LLC v. BCR Safeguard Holding, LLC, 85 A.D.3d 506, 508, 924 N.Y.S.2d 391, 394 (2011). Here, the interest rate swap was not useless. Rather, the swap functioned as intended by protecting Caper from potentially high variable interest rates and providing Caper fixed interest payments rather than unpredictable, variable interest payments. Caper paid the amount of interest it agreed to and expected to pay under the Swap Agreement. Thus, the contract's purpose was not frustrated.

As for mutual mistake, mutual mistake may be a ground for reforming or rescinding a contract where "the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement." Chimart Assocs. v. Paul, 66 N.Y.2d 570, 573–74, 489 N.E.2d 231, 233–34 (1986). "The mutual mistake must exist at the time the contract is entered and must be substantial. The idea is that the agreement as expressed, in some material respect, does not represent the 'meeting of the minds' of the parties." Gould v. Bd. of Educ. of Sewanhaka Cent. High Sch. Dist., 81 N.Y.2d 446, 453, 616 N.E.2d 142, 146 (N.Y. 1993).

Caper fails to plausibly allege any mutual mistake. Although Caper attaches great importance to the parties' alleged understanding that the one-month LIBOR rate "was a rational and fundamentally sound choice for a floating rate, which represented a free market rate at which solid and stable financial institutions lend money," Compl. ¶ 146, this understanding was irrelevant to the Swap Agreement. The complaint shows that the parties chose the one-month LIBOR rate not for its virtue as a fundamentally sound market indicator, but in order to match the terms of the proposed Refinance Loan. See Compl. ¶¶ 18–24. Thus, whether the chosen variable rate was fundamentally sound or utterly irrational, Caper was protected from a rise in interest rates. The interest rate swap performed as the parties expected: Caper paid an effective fixed interest rate for the Refinance Loan. Thus, any mistake the parties made regarding the LIBOR rate was not material. Accordingly,

20

Caper's claim for rescission or reformation due to mutual mistake fails.

Finally, in its tenth claim, Caper seeks rescission or reformation of the Swap Agreement because of the Swap Agreement's "unsuitability" for Caper. Id. ¶¶ 153–58. Specifically, Caper asserts that the mismatch between the durations of the Refinance Loan and the Swap Agreement resulted in a Swap Agreement that did not hedge against interest rate risk but was instead "nothing more than a bet on the movement of interest rates." Id. ¶ 157.

New York law does not recognize a claim for "unsuitability." See, e.g., Sofia v. Mass. Mut. Life Ins. Co., No. 02-CV-6088T, 2004 WL 1792441, at *4 (W.D.N.Y. Aug. 10, 2004) (unpublished). Alternatively, to the extent the cases cited by Caper support the existence of a claim for unsuitability, New York law requires a fiduciary relationship between the parties. See Pl.'s Resp. Opp. Mot. Dismiss 28; In re Estate of Rothko, 401 N.Y.2d 305, 320–22, 372 N.E.2d 291, 297–98 (1977); In re Estate of Witherhill, 37 A.D.3d 879, 880–81, 828 N.Y.S.2d 722, 724–26 (2007); Scalp & Blade, Inc. v. Advest, Inc., 309 A.D.2d 219, 225–29, 765 N.Y.S.2d 92, 97–99 (2003). As discussed, Caper has failed to plausibly allege any fiduciary relationship. Moreover, the Swap Agreement did in fact hedge against interest rate risk. Accordingly, this claim fails.

III.

In sum, Caper has failed to state a claim upon which relief can be granted. Accordingly, the court GRANTS Wells Fargo's motion to dismiss [D.E. 12].

SO ORDERED. This **22** day of August 2013.

JAMES C. DEVER III
Chief United States District Judge